**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| BARBARA J. PUMPHREY,<br><br>              Plaintiff,<br><br>v.<br><br>LIFESCAN INC.,<br><br>              Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:05CV851DAK |

     This matter is before the court on Defendant LifeScan, Inc.'s Motion for Summary Judgment. The court held a hearing on the motion on January 20, 2010. Plaintiff was represented by David J. Holdsworth, and Defendant was represented by Matthew M. Durham and Lauren Shurman. Having fully considered the motion, memoranda, affidavits, and exhibits submitted by the parties and the facts and law relevant to this motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

     LifeScan has formal, written polices that prohibit discrimination, harassment, and retaliation in the workplace. LifeScan hired Pumphrey as a Professional Sales Representative in March 1999. She sold blood glucose meters to doctors, pharmacies, and hospitals in a sales territory that covered Utah and part of Wyoming. In connection with her sales work, Pumphrey

was required to log her customer calls into a database referred to as STARS. For business expenses in connection with her employment, LifeScan gave Pumphrey the use of a company car, a GE Fleet card for gas purchases, and an American Express corporate card ("AMEX card"). Pumphrey was required to submit timely expense reports and receipts for purchases made on her AMEX card.

Pumphrey was initially supervised by Bob Wisell. In her first performance evaluation, in 1999, Wisell noted that "it is especially important that expense reports be submitted weekly and STARS reports be continuously updated per direction." In October 2001, Wisell met with Pumphrey to discuss deficits in Pumphrey's administrative responsibilities. In a follow-up letter to that meeting, Wisell stated that it "

> was a serious discussion and as I indicated, with implications about your career at LifeScan, Inc. I was very pleased to hear you acknowledge you[r] role in how these matters came to be as "big" as they did. As you noted the amount of data needed to be corrected and "cleaned up" in STARS is considerable. However, we agreed it needs to be completed. . . . I noted my continued concern with you complying with submitting your expense reports in a timely manner. Your acknowledgment and disappointment in yourself for not having submitted these was actually encouraging to me to hear. . . . Due to the ongoing issues you have encountered in managing your time to communicating successfully to STARS, inputting current and accurate data into the data base, and submitting your reports on time, you absolutely must focus your time and energy into making these processes a part of your everyday work. . . . At the beginning of 2002 we will review these aspects of your work and discuss furthering your career direction accordingly.

In a later 2001 annual performance evaluation, Wisell noted areas of improvement to be STARS processes and expense report submissions, which were items that he stated had been discussed repeatedly.

In mid-2002, Nick Theodore replaced Bob Wisell as Pumphrey's supervisor. Theodore's management style differed from Wisell's. Theodore took a more active role in managing his sales representatives. In July 2002, Theodore emailed his entire team, including Pumphrey, requesting that each sales representative complete and submit a "call zoning plan" to reflect how the sales representative could target sales efforts in his or her territory. Theodore stated that many representatives had told him that there were not enough hours in the day to accomplish everything. In response, he stated that their best option is to change the way they actually use the time they have to make it as effective as possible.

Several weeks later, Pumphrey responded to Theodore's email, stating that she repeatedly discussed workload coverage concerns with Wisell and that there was a need for a Pharmacy Detail Organization ("PDO") to be allocated to her territory. She noted that with her workload problems, she had let her expense reports slip behind because she did not feel that it affected business directly.

In January 2003, Theodore corresponded by email with all of his sales representatives to discuss budget issues and inform than that they all needed to work within budgets. This was also a different emphasis than Wisell has had. Theodore gave them their individual budgets and guidelines for tracking their budgets, indicating that all sales representative would need to submit tracking forms on a quarterly basis.

Pumphrey's first personal encounter with Theodore was in November 2002. Pumphrey was late to a meeting with her team and she alleges that Theodore threatened to deny her certain sales incentives. Pumphrey claims that she found it disconcerting because she had told Theodore that she would be late. The next day, Pumphrey called Theodore to tell him she was bothered by

what happened, and he allegedly stated that if she wanted to come down to his room, they could talk about it. Pumphrey found the statement a little bit odd and she was uncomfortable with it.

Several weeks later, in November 2002, Pumphrey and Theodore had their first scheduled "ride-with," in which Theodore accompanied Pumphrey on her calls to customers for a day. During this ride-with, Pumphrey alleges that Theodore made inappropriate comments, including: using a hostile tone about the number of urgent voicemails she had left him; asking if she cries easily and stating that he tends to make women cry; telling Pumphrey about two women he had to fire because they were too emotional; confronting Pumphrey about what he referred to as an "all about Barb" program; referring to a waitress as an old coot; telling Pumphrey that his wife was pregnant and stating that it "happened the first time, it pissed me off." Pumphrey testified that Theodore's approach left her feeling an "aura of sex discrimination." She stated, however, that she did not know whether Theodore treated women differently than men in this regard.

At the end of the November ride-with, Theodore gave Pumphrey feedback on how she approached sales calls. Pumphrey cannot remember the exact words, but she alleges that Theodore made her start to cry. After the ride-with, Pumphrey called an Employee Assistance Program ("EAP") hotline set up by LifeScan to report that she was disturbed by the ride-with. The EAP representative suggested that Pumphrey report her concerns to LifeScan's human resources department, but Pumphrey declined to do so until January 2003, when she encountered LifeScan's human resources manager, Teri Schwier, at a meeting in Toronto.

At the meeting in Toronto in January 2003, Pumphrey discussed Theodore with three other sales representatives. Pumphrey and two other sales representatives approached Schwier to tell her about their problems with Theodore. Schwier later interviewed Pumphrey and the other

women separately. Pumphrey expressed her concerns with Theodore's management style and comments. Schwier then interviewed Theodore and other sales representatives under his management.

As a result of Schwier's investigation, LifeScan placed Theodore on a Final Written Warning, required Theodore to complete a Manager and the Law training course in April 2003, required Theodore to attend sexual harassment training in May 2003, denied Theodore any opportunities for promotions, transfers, salary increases or bonuses for six months, warned Theodore that any further inappropriate conduct or acts of retaliation would result in further disciplinary action up to and including termination, required Theodore's supervisor, Rich Doubleday, to supervise and accompany Theodore on his next round of ride-withs and performance evaluations, and required Doubleday to provide further coaching to Theodore regarding his management style.

Pumphrey alleges that she was unaware of the results of her complaint. She testified that she was told that it was LifeScan's policy not to give other employees the details of another employee's discipline. She testified that she was told it was a serious matter, something she doubted based on what she felt was an attempt to minimize Theodore's conduct in her interview with Shwier. She also stated that there were rumors that LifeScan did not take these kinds of reports seriously, but none of her allegations are based on any credible or admissible evidence. She did testify, however, that she was encouraged to report any additional behavior that made her uncomfortable.

Pumphrey's next face-to-face encounter with Theodore was her performance evaluation, at which Doubleday was also present to supervise Theodore. At the performance evaluation,

Theodore apologized for having said some things that were offensive and said that it was not his intent. In the performance evaluation, Theodore noted several areas of concern. He noted that: Pumphrey's expenditures far outweighed her set budget and that she continued to ineffectively manage her budgets; Pumphrey did not meet administrative deadlines, such as expense reporting, and that they had had numerous discussions on meeting timelines during the year; Pumphrey needed to better use STARS to manage her calls and needed to update her call lists because it inflated her workload limits; Pumphrey's expense reports were frequently six to eight weeks late and had numerous errors; and Pumphrey's use of her AMEX and GE cards did not comply with company policy.

Pumphrey submitted her own comments to be included in her 2002 evaluation. In those comments, she stated that new management had new concerns and she agreed with every area of concern brought to her attention. She agreed that she would work on each of the areas of concern.

Pumphrey's next encounter with Theodore was a ride-with in April 2003, at which Doubleday was also present. Pumphrey described the April ride-with as pretty standard and nondescript. Following the April ride-with, Doubleday summarized his concerns with Pumphrey's administrative tasks in an email. He told Pumphrey that she needed to reduce her territory workload to around 1600 calls. Pumphrey responded that she was still not where they or she would like her to be on administrative issues. She committed to submitting weekly expense reports and faxing in daily customer needs tracking forms.

For the next three months, Pumphrey faxed her call list to Theodore on a daily basis. Pumphrey knew of only one other sales representative who did this and she did it for sales

performance. Pumphrey, however, was a top seller for the company and had no problem with sales performance. She did not know if anyone else faxed in reports on a daily basis for any reason.

In June 2003, Theodore and Pumphrey had a conference call regarding concerns Theodore had with Pumphrey's expense reports. Pumphrey alleges that Theodore began needling her about expense reports around this time. LifeScan contends, however, that the evidence demonstrates that Pumphrey had long-standing issues with her expense reports. Theodore questioned Pumphrey regarding specific expenses. Pumphrey appears to have inappropriately submitted a duplicate charge, which she was asked to correct. She was questioned about a gas expense that she explained adequately. Theodore also pointed out that Pumphrey had several personal charges on her AMEX card. Pumphrey was not attempting to get paid for the personal expenses, but it was against company policy for any personal charges to be on the corporate AMEX card.

Theodore claims that he reminded her of the policy that the card was only to be used for business purposes. Pumphrey claims that this was the first that she had heard of the company's 2001 policy that there could be no personal charges on the AMEX. Pumphrey also alleges that she said she had to put personal charges on her AMEX because her personal bank account was depleted as a result of the company's slow turn around on expense reports which required her to pay the bill out of her personal account. Pumphrey states that Theodore did not seem to understand her explanation. LifeScan attributes the slow turn around time on the expense reports to Pumphrey's own delays in submitting them and the number of errors on the reports. In any event, LifeScan claims that even if there was a slow turn around, it did not provide a basis for

Pumphrey to disregard a company policy regarding personal charges on the corporate card.

At her deposition, Pumphrey testified that she told Theodore at the end of the conference call that she would refrain from putting personal charges on her AMEX card. In an email to Theodore, Pumphrey also stated that she had used her AMEX card for personal use, but she had paid off those charges and would refrain from doing it in the future as they had discussed. Pumphrey testified that she did not know whether Theodore had similar discussions regarding expense reports with other sales representatives.

Pumphrey's next personal encounter with Theodore was a ride-with in June or July 2003. Pumphrey described the ride-with as subdued and noted that Theodore was not negative. Pumphrey, however, alleges that while visiting a pharmacy, Theodore showed her a box of extra-large condoms and said, "This is my size." Pumphrey states that she ignored the comment and did not report it to Schwier in the human resources department. Pumphrey claims that she thought it would be futile to make the report because of the way the past report was handled.

Pumphrey and Theodore had another ride-with in September 2003. Pumphrey alleges that at a pharmacy, Theodore showed her a package of dietary supplements intended to enhance male sexual performance and stated that "he'd been needing to use those lately." Pumphrey testified that she ignored the comment. Pumphrey also alleges that in connection with the ride-with, she had bought Theodore some nuts as a snack and when he could not find them in the car, he asked her, "Where are my nuts?" while touching his groin area. Pumphrey alleges that while Theodore reached across the driver's side of the vehicle to get the nuts, his elbow touched her thigh.

Pumphrey did not report either incident during the September ride-with to Schwier in the

human resources department. Again, Pumphrey alleges that because she did not know how the company had responded to her first complaint, she thought it would have been futile to make the report.

During this time, problems continued with Pumphrey's expense reports. LifeScan's expense reporting department sent the several notifications to Theodore and/or Schwier regarding Pumphrey's AMEX account and expense reporting: an AMEX reminder statement dated September 2, 2003, indicating that her AMEX account had past-due balances, an email dated October 31, 2003, listing eight expense reports that were being held up due to lack of receipts from Pumphrey, a Notification of Audit Review dated November 11, 2003, indicating that Pumphrey had failed to submit a receipt for a charge dating back to March 2003, a Notification of Audit Review, dated December 1, 2003, indicating that Pumphrey failed to submit a receipt for charges dating back to March 2003 and a cellular phone bill was missing for March 2003, an email from Johnson & Johnson Finance Business Services dated December 11, 2003, indicating that Pumphrey's AMEX account had a past due balance of $5,421.34.

Although Pumphrey had agreed in June 2003 to discontinue personal charges on her company AMEX card, her July statement had charges to The Gap, Vita Power, Express Clothing, Wherehouse Music, Nordstrom, Banana Republic, and Lerner New York clothing store. The August statement had many of the same personal charges. At her deposition, Pumphrey acknowledged that she did not refrain from using her company AMEX for personal charges, but she testified that she believed that she had minimized her charges.

In light of continuing problems, Theodore and Schwier had a conference call with Pumphrey in November 2003. After discussing some other issues, Schwier confronted

Pumphrey with the fact that she was still using her company AMEX card for personal charges. When Shwier asked her whether she understood that she could not do so, Pumphrey responded that she would refrain from doing it. Pumphrey was told that the audits on her expense reports began due to the personal expenses on her AMEX card.

Theodore's notes from the day after the conference call state that Pumphrey was evasive when the issue of personal charges on the AMEX card was raised. He wrote that Pumphrey said she was only four weeks behind in expense reports when she was actually eight weeks behind. She also said that she had only three reports with outstanding expenses, but she had eleven. He noted that she said that her personal charges were all paid off, but he commented that with her backlog it is hard to tell. His notes also demonstrate that he did not understand or believe Pumphrey's explanation for why she had continued to put personal charges on her AMEX card after they had discussed the issue in June. His notes state: "The reasons she gave for it were because the company was withholding expenses for several months and she did not know how she was going to get paid so she used her Amex case. ?? This was so confusing that I asked her several times to clarify and this is what we concluded. The logic here was so ridiculous since she gets paid through her bank account that I could not see why the spending continued. I truly got the feeling that there was no real reason but that this was the best excuse she could come up with even though it was clearly discussed that this should stop."

The reasoning provided by Pumphrey for her continued use of the corporate AMEX card for personal charges is confusing. She was required to pay off the AMEX card and get reimbursed by the company. If the company was delaying payment on expenses, putting additional personal charges on her corporate card would not provide Pumphrey with any benefit.

In addition, the personal charges on the corporate AMEX card is what prompted the audits of her reports and caused the delays. Pumphrey, however, suggests that LifeScan's failure to accept her reasoning or do something to expedite her expense payments is evidence of pretext. There is no evidence, however, that her expense payments were more delayed than other employees. And, significantly, five employees were terminated for misuse of their corporate credit cards. Therefore, there is no evidence that Pumphrey was singled out with respect to this issue.

With respect to allegations regarding retaliation, Pumphrey alleges that Theodore did not allow her to become a member of the marketing team in March 2003. The position would have been in addition to her regular job duties. Theodore sent Pumphrey an email stating that once her administrative issues "are handled and more effectively managed I would certainly recommend you for a place on this team. Unfortunately, your administration continues to be a challenge. I hope that your pared down called-on list will help alleviate this issue but I suggest that we wait and see what happens. I think that is much more important to effectively manage all facets of your own business before taking on any additional challenges."

A short time later, another position within LifeScan opened up that involved selling a hospital-based product but Theodore would not release Pumphrey to apply for the position. Pumphrey alleges that it was in retaliation for her complaints and LifeScan alleges that it was because LifeScan required a set of computer skills for the position that Pumphrey did not possess. Pumphrey claims that LifeScan was not aware of her computer skills when she sought to be released for the position. In any event, at her deposition, Pumphrey testified that she did not know whether Theodore was involved in the decision at all and she had no reason to believe that he was involved.

Pumphrey also alleges that Theodore would not approve her to be on a LifeScan fleet management committee in which she would provide feedback to the company for all-wheel drive vehicles. Pumphrey testified that Theodore told her that she already had constraints on her time and he did not want to add any extra work on her.

Pumphrey also contends that Theodore retaliated against her by calling her every Friday between 3:00 and 5:00 p.m. with administrative questions. Pumphrey thought it was retaliatory because it was out of the norm. She admitted, however, that he had the right to call her whenever he wanted. She also testified that she did not know whether other sales representatives had issues with the timing of Theodore's calls.

Pumphrey further alleges that Theodore retaliated by giving her a hard time when she asked for time off to help her daughter who had been hit by a car. He told her that she could go when she was caught up. Pumphrey complained to Schwier in the human resources department and was told she could immediately go.

Pumphrey contends that Theodore also failed to obtain additional sales support for her territory. Pumphrey admits that she had expressed workload concerns with Wisell as early as 2002. She also identified this issue to Theodore as soon as he replaced Wisell in July 2002. These complaints, therefore, pre-dated her complaints regarding Theodore in January 2003.

Finally, Pumphrey contends that the most significant retaliation was her termination on December 8, 2003. Theodore and Christy Shearer flew to Utah to meet with Pumphrey. They explained to her that her termination was based on her use of her company AMEX card for personal charges after she had been told not to do so. LifeScan policy for refusal to comply with instructions from supervisors and willful disregard of company policy are "Group I" behaviors

that may result in immediate discharge without prior counseling or warning. Between 2002 and 2004, Lifescan terminated five employees for improperly using their AMEX cards, including Pumphrey. Two of the five terminated were men. Pumphrey claims that although she continued to put personal charges on her corporate AMEX after her June 2003 discussion with Theodore about it, she discontinued personal charges on her AMEX after the November telephone conference with Theodore and Schwier. Pumphrey, therefore, questions whether her dismissal in early December was related to her improper use of the AMEX card.

At the time of her termination, Pumphrey also had 26 expense reports that were being held by the expense reporting department because she had failed to submit supporting receipts or there were other audit questions. Pumphrey alleges that she was not told about the problems with the expense reports and they were being delayed by Theodore. There is evidence that Pumphrey was contacted directly by the expense department on these matters, but Pumphrey denies that she was aware of the extent of the problems.

## DISCUSSION

### Defendant's Motion for Summary Judgment

Defendant LifeScan moves for summary judgment on each of the claims asserted in Plaintiff's Complaint. Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56 (c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell*

*Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Gonzales v. Millers Casualty Ins. Co.,* 923 F2d 1417, 1419 (10th Cir. 1991). All material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. DUCivR 56-1(c).

In considering whether genuine issues of material fact exist, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.) *cert denied,* 112 S. Ct. 97 (1991).

**I. Pumphrey's Sex and Age Discrimination Claims**

In her Complaint, Pumphrey alleges that she was discriminated against based on her sex and her age in violation of Title VII of the Civil Rights Act of l964 ("Title VII") and the Age Discrimination in Employment Act (the "ADEA"). Pumphrey, however, decided to drop her age discrimination claim during the briefing of the summary judgment motion. Therefore, the age discrimination claim is no longer viable.

Both parties agree that the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Pumphrey's Title VII claim. *See McDonnell Douglas*, 411 U.S. at 802-05; *Riggs v. Air Tran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007). Under this analysis, Pumphrey must first establish a prima facie case of unlawful discrimination

14

by a preponderance of the evidence. Once that prima facie case is established, the burden shifts to LifeScan to produce a legitimate, nondiscriminatory reason for Pumphrey's discharge. At this stage, LifeScan's burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If LifeScan produces a legitimate reason for Pumphrey's discharge, Pumphrey must prove that LifeScan's stated reason is pretextual. *Id.* If Pumphrey's evidence of pretext is insufficient, LifeScan is entitled to summary judgment as a matter of law. Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 143.

### A. Prima Facie Case

LifeScan contend that Pumphrey fails to make out a prima facie case of gender discrimination under Title VII. To make out a prima facie case of discrimination under Title VII, Pumphrey must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class. *DeWalt* v. *Meredith Corp.,* 288 Fed. Appx. 484, 492 (10th Cir. 2008).

With respect to her gender discrimination claims, Pumphrey claims she was subjected to disparate treatment based on the comments Theodore made during the ride-withs. She did not accompany Theodore on ride-withs with male employees and does not know what he talked to men about. But, she states that the nature of the comments made to Pumphrey support the reasonable inference that he did not. The sales representatives who complained to human

resources were all women.

Pumphrey relies on comments during the ride-withs as her adverse action, but for an action to be considered an adverse action, it must effect a "significant change in the plaintiff's employment status." *Haynes v. Level 3 Comms., LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006). There was no change in Pumphrey's employment status caused by Theodore's alleged comments. Random offensive comments do not rise to the level of an "adverse employment action." *See, e.g., Vazquez v. Southside United Hous. Dev. Fund Corp.*, 2009 U.S. Dist. LEXIS 74480 at *37 (E.D.N.Y. Aug. 21, 2009); *Stella v. Slater*, 2000 U.S. Dist. LEXIS 18292 at *19 (D.D.C. Dec. 8, 2000).

Even if these comments did rise to the level of an adverse employment action, Pumphrey does not present any evidence regarding Theodore's comments to male sales representatives. Pumphrey cannot base her prima facie case on an inference that Theodore would not talk about his sex life with other males. Theodore's comments such as his wife got pregnant the first time, he uses extra large condoms, and he has been needing to use dietary supplements to enhance his performance could easily have been made to other men. Moreover, Pumphrey stated that she simply ignored the comments and there is no evidence that Theodore persisted. Even though the court must find every inference in favor of the party opposing summary judgment, the court concludes that there is no basis to support Pumphrey's inference that Theodore would only make comments regarding sex to women. Moreover, there is no evidence that women were exposed to disadvantageous terms or conditions of employment to which men were not exposed.

In addition, Pumphrey alleges that she was one of only two employees she was aware of who had to fax in call reports on a daily basis, both of whom were women. Pumphrey agreed to

16

do the call reports daily for three months in an effort to reduce her workload. The other woman required to do daily reports had sales performance issues, which Pumphrey did not.

At most, the daily reports were a minor inconvenience, not an adverse employment action. *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009). Pumphrey does not contest the evidence in the record demonstrating that she agreed to do the daily reports as a means to reduce her overselling. Moreover, Pumphrey has no evidence that men and women at LifeScan were treated differently in this regard, she merely speculates that none of the men ever faxed in daily reports.

Pumphrey further contends that she was treated differently than men with respect to discipline. However, Pumphrey does not compare herself to any similarly situated men. While LifeScan took substantial steps in its discipline against Theodore for improper comments, it did not terminate him. But Theodore had not been warned to discontinue the comments prior to the discipline he received. Pumphrey, in contrast, had been told to stop putting personal charges on her corporate AMEX card several times prior to being terminated.

Pumphrey has not demonstrated that she was treated less favorably than male employees. Pumphrey has no admissible evidence to show that similarly situated male employees were treated more favorably than she was with respect to the use of their AMEX cards. To satisfy her burden, Pumphrey must put forth evidence to show that male employees who had the same supervisor and who were subjected to the same standards and policies were not terminated for conduct of "comparable seriousness." *EEOC* v. *PVNF, LLC,* 487 F.3d 790, 801 (10th Cir. 2007); *Timmerman* v. *U.S. Bank,* 483 F.3d 1106, 1121 (10th Cir. 2007).

Pumphrey was terminated for continuing to use her AMEX card for personal purchases

even after being reminded by her supervisor on several occasions that such conduct was contrary to company policy, and even after she stated to her supervisor that she would refrain from using her AMEX card for personal reasons. Pumphrey has no admissible evidence to show that *any* male employees engaged in comparable misconduct, let alone male employees under Theodore's supervision. Moreover, Pumphrey has no admissible evidence to show that any such employees were not disciplined or terminated. To the contrary, LifeScan has evidence to show that both male and female employees were terminated for misusing their AMEX cards. Therefore, the court concludes that Pumphrey has not established a prima facie case of gender discrimination.

## B. Pretext

Assuming that Pumphrey did state a prima facie case of gender discrimination, Pumphrey admits that LifeScan met its burden with respect to proffering a reason for her termination–violation of the company policy against putting personal charges on her company AMEX card. But Pumphrey claims that LifeScan's stated reason for her termination was a pretext for discrimination. LifeScan, however, argues that Pumphrey cannot show pretext as a matter of law and summary judgment on Pumphrey's Title VII claim is appropriate on this basis as well.

Pumphrey must counter LifeScan's explanation for its employment decisions by presenting enough evidence to support an inference that LifeScan's reason is merely pretext for gender discrimination, "by showing either that a discriminatory reason more likely motivated [LifeScan] or ... that [LifeScan's] proffered explanation is unworthy of credence." *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1478 (10th Cir. 1996) (quotation marks and citations omitted)); *see also Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1396 (10th Cir. 1997)

("even though a plaintiff has established a prima facie case, the defendant is entitled to summary judgment unless the plaintiff produces either direct evidence of discrimination or evidence that the defendant's proffered reason for the action taken was pretextual").

To show that LifeScan's proffered nondiscriminatory reason was actually a pretext for discrimination, Pumphrey must demonstrate that LifeScan's proffered reason is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Cooper v. Wal-Mart Stores, Inc.*, 296 Fed. Appx. 686, 689 (10th Cir. 2008) (internal citations omitted).

Pumphrey has no evidence to show pretext, other than her own subjective belief, which is not sufficient to withstand a motion for summary judgment. *See Schultz v. Gen. Elec. Capital Corp.*, 37 F.3d 329, 334 (7th Cir. 1994) (noting that "self-serving remarks standing alone are insufficient to raise doubt as to the credence of [the employer's] explanation"). Pumphrey cannot show that LifeScan's reason for her termination is false--she admits that she was using her AMEX for personal charges contrary to company policy and after she was warned not to use it.

Pumphrey alleges that LifeScan's proffered reason for her termination is pretext because other sales representatives were allowed to use their AMEX cards for personal charges, but she has no admissible evidence to support this allegation. There is no evidence to show that similarly situated employees were treated differently from Pumphrey in this respect.

Pumphrey also argues that LifeScan's failure to implement progressive discipline for the problem demonstrates pretext. "In order to establish pretext based on a procedural irregularity, a plaintiff must identify an applicable written or unwritten policy or procedure that the employer failed to follow." *Cooper v. Wal-Mart Stores, Inc.*, 296 Fed. Appx. 686, 695 (10th Cir. 2008)

(citing *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007)). Pumphrey does not cite to a written policy. Rather she claims that her supervisor promised to either give her a free pass for administrative shortfalls or put her on a progressive discipline program if it became a more serious problem. Pumphrey states that these comments, however, were made in relation to her delays in submitting expense reports and her problems with the STARS system. Pumphrey does not point to any such discussion regarding her practice of putting personal charges on her corporate AMEX card. The only evidence in the record was that she was told to stop the practice and she agreed to stop it. She does not dispute that she then continued to put personal charges on the card, contrary to company policy, the admonitions of her supervisor, and her own agreement not to do it.

Pumphrey has not presented any evidence that LifeScan's procedural shortfall was "disturbing," often exemplified "by an employer's falsifying or manipulating of relevant criteria." *Id.* Pumphrey cannot point to any policy that would indicate that LifeScan was required to first issue a formal warning or any other progressive discipline prior to terminating her employment. LifeScan did not deviate from its policies, which clearly state that insubordination, refusing to follow a supervisor's directive, and willful disregard of company policy are all grounds for immediate termination.

Finally, even assuming for the sake of argument that LifeScan failed to follow some unwritten progressive discipline policy by immediately terminating Pumphrey's employment, that would not be sufficient to show pretext, standing alone. *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) ("even if T-Mobile fell short of Berry's expectation of progressive discipline, this fact adds little to the pretext analysis. The mere fact that an employer

failed to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual."); *Riggs*, 497 F3d at 1121 (holding that employee did not show pretext even where the employer admitted that it failed to obtain a statement from the employee prior to terminating her, contrary to usual practice, concluding that, "[a]lthough allowing Ms. Riggs to complete her side of the story would seem to be the most fair way of addressing the situation, we cannot say that [her supervisor's] failure to do so in these circumstances constitutes a disturbing procedural irregularity sufficient to prove pretext."). In sum, Pumphrey does not have sufficient evidence to convince a rational fact finder that LifeScan's reasons for her termination are unworthy of belief. Accordingly, LifeScan is entitled to summary judgment on Pumphrey's disparate treatment claims under Title VII.

## II.  Sexual Harassment -Hostile Environment Claim

To establish that a sexually hostile work environment existed, Pumphrey must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiffs employment and created an abusive working environment. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).  To survive summary judgment on a claim alleging a sexually hostile work environment, Pumphrey must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment" and that she was "targeted for harassment" because of her gender.  *Herrera v.*

*Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir.2007) (quotation omitted). In determining whether the harassment is severe or pervasive, the court must consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiffs position. *Id.*

Further, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Thus, the court must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes, and occasional teasing," so that the anti-discrimination laws do not become a "general civility code." *Id.*

Pumphrey's allegations are not sufficiently severe or pervasive to constitute an actionable hostile work environment as a matter of law. Pumphrey admits that she cannot rely on any alleged comments by Theodore that are unrelated to her protected status. The hostile environment must be the result of discrimination based on Pumphrey's protected status and incidents unrelated to her gender cannot be used as support for her hostile environment claim.

The allegations on which Pumphrey relies to support her hostile work environment claim consist of the following events:

• During the November 2002 ride-with, Mr. Theodore allegedly asked Pumphrey if she cried easily and stated that he "tend[s] to make women cry."

• Pumphrey alleges that, in June or July 2003, Mr. Theodore showed her a box of extra large condoms and said, "This is my size."

• Several months later, Mr. Theodore allegedly showed Pumphrey a package of dietary

supplements intended to enhance male sexual performance while stating that "he'd been needing to use those lately."

• That same day, Mr. Theodore allegedly asked Pumphrey "Where are my nuts?" while touching his groin area when he could not find the nuts that she had provided to him as a snack.

• While sitting in the car, Pumphrey alleges that Mr. Theodore reached across her to get the nuts, and in doing so, his elbow touched her legs above the knee.

In determining whether conduct is objectively severe or pervasive, relevant considerations include: the frequency of conduct, the severity of conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance. *See Faragher*, 524 U.S. at 787-88.

In this case, the isolated incidents do not give rise to a workplace that was objectively hostile. The comments and conduct complained of were not frequent (consisting of only a few isolated incidents over the span of a year) and were not physically threatening. Pumphrey states that they were frequent during their face-to-face contact, but these were not their only contact. There are no allegations of statements or comments from the many telephone conversations or emails during the time period. In fact, most of their contact was by telephone and email because they lived and worked in different states. In addition, the comments during the ride-with days are limited and did not occur at every ride-with.

Pumphrey admits that, after she complained about Theodore in early 2003, LifeScan supervised all of Theodore's interactions with her for the next several months, and Theodore apologized "for having said some things that were offensive." Pumphrey did not complain about

23

any alleged incidents of sexual harassment after receiving this apology from Theodore. While Pumphrey claims that she believed reporting would be futile, she fails to acknowledge that she was aware of some of the steps that were taken with Theodore after the first complaint, such as supervised contact. Thus, Pumphrey's allegations are insufficient to establish the "severe and pervasive" element of a sexual harassment claim as a matter of law.

In addition, the evidence does not support Pumphrey's claim that she subjectively perceived her workplace to be so permeated with discriminatory intimidation, ridicule, and insult so as to alter the conditions of her employment. To the contrary, Pumphrey testified that she simply "ignored" several of Mr. Theodore's comments.

The court concludes that Pumphrey has not demonstrated the severe and pervasive atmosphere necessary to establish a hostile work environment claim. No reasonable juror could conclude that Pumphrey's workplace was objectively or subjectively hostile so as to alter the terms and conditions of her employment. Accordingly, the court grants summary judgment in favor of LifeScan on Pumphrey's hostile environment claim.

## III. Retaliation Claim

Plaintiff contends that her retaliation claim is the real focus of her complaint. In the absence of direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies to a claim for retaliation. *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009). Under this framework, Pumphrey must establish a prima facie case of retaliation by showing: (1) a protected employee action, (2) an objectively materially adverse employer action either after or contemporaneous with her protected action, and (3) a causal connection between the protected action and the adverse action. *Id.* The second element of the prima facie case requires Pumphrey

24

to show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53,63 (2006). This stage of the analysis must filter out trivial harms such that Title VII does not become "a general civility code for the American workplace." *Id.* at 68.

Once Pumphrey establishes a prima facie case, the burden shifts to LifeScan to articulate a nondiscriminatory reason for its action. *See Medina v. New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005). Thereafter, the burden shifts back to Pumphrey to prove that the legitimate reasons offered by LifeScan were not its true reasons, but rather pretext for retaliation. *See id.*

### A. Materially Adverse Action

Pumphrey alleges numerous retaliatory acts Theodore committed after her January 2003 complaint to Schwier, including: (1) Theodore gave her an "unfair" performance evaluation; (2) Theodore increased the number of administrative tasks that she was required to complete and subjected her to additional scrutiny, such as requiring daily faxes and "nitpicking" her expense reports; (3) Theodore did not allow her to become a member of a LifeScan marketing team or to participate in a "fleet management committee"; (4) Theodore did not release her to apply for another position within LifeScan selling a hospital-based product; (5) Theodore began calling her every Friday between the hours of 3:00 and 5:00 p.m. with administrative questions; (6) Theodore gave her a difficult time about taking time off to visit her daughter; (7) Theodore did not provide support when doctors were dropping out of her database; (8) Theodore did not provide additional sales support to cover Pumphrey's territory; and (9) Pumphrey's employment was terminated in December 2003.

LifeScan argues that the only alleged act that could constitute an adverse employment action is Pumphrey's termination. Pumphrey argues that while none of the above adverse actions may be, in and of themselves, "materially adverse," the court should consider the cumulative effect of all these actions. *Wells v. Colorado Dept. of Transportation*, 325 F.3d 1205 (10th Cir. 2003). She claims that all of these actions establish that Theodore treated her more favorably before she complained than he did after she complained.

Courts have held that simply receiving negative marks on a performance review, unaccompanied by other adverse employment actions, is not sufficient to give rise to a prima facie case of retaliation. *Fox v. Nicholson*, 304 Fed. Appx. 728, 733 (10th Cir. 2008). Moreover, Pumphrey cannot establish a causal connection between her complaint to Schwier and Theodore's comments in her performance review. Pumphrey received similar feedback in a prior performance appraisal from her former supervisor. Indeed, Wisell noted in Pumphrey's 2001 performance appraisal that "there were ... areas that need improvement. Specifically, I am referring to the STARS processes and the expense reports submissions that we discussed repeatedly."

Also, excessive scrutiny of expense reports and requiring her to fax call lists on a daily basis for a three-month period, starting in approximately late May 2003, do not rise to the level of "materially adverse employment actions" as a matter of law. *See, e.g., Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (holding that requiring plaintiff to submit regular status reports was a "minor inconvenience," not a materially adverse employment action sufficient to support a claim of retaliation); *Hobbs v. City of Chicago*, 573 F.3d 454, 463-64 (7th Cir. 2009) ("A materially adverse action must be more disruptive than a mere inconvenience or an alteration of

26

job responsibilities"); *Dotson v. City of Syracuse*, 2009 WL 2176127 at *18 (N.D.N.Y. July 21, 2009) ("an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action"); *Ahern v. Shinseki*, 2009 WL 1615402 at *7 (D.R.I. June 9, 2009) (alleged incidents of increased scrutiny by employer were not materially adverse).

Pumphrey agreed to fax the call lists daily as a means of helping her workload. This agreement did not occur until May 2003 and was in response to long-standing administrative and workload issues that pre-dated the January 2003 complaint. In addition, the time frame for beginning these daily faxes is significantly removed from the January complaint. *See Uragami v. Home Depot USA, Inc.*, 2005 WL 2177232 at *8 (D. Utah Sept. 2, 2005) (holding that a time gap of three-and-a-half months between protected opposition and alleged retaliatory act was insufficient to establish a causal connection, noting that the "Tenth Circuit seems to have drawn the line ... around nine weeks").

In addition, denying Pumphrey's desire to participate in extra-assignments on the marketing team and fleet management teams cannot be considered materially adverse action. Pumphrey admitted that her workload was excessive. Pumphrey's own complaints about her workload, in addition to the undisputed evidence that Pumphrey was repeatedly late in submitting her expense reports, demonstrate that LifeScan had a legitimate basis for declining to provide Pumphrey with additional responsibilities. The burden therefore shifts to Pumphrey to demonstrate pretext, which she cannot do. Pumphrey has no evidence to show that similarly situated employees were treated more favorably or that Theodore acted with the purpose of retaliating against Pumphrey. Pumphrey's retaliation claim therefore fails to the extent that it is

based on Theodore's failure to recommend her for these two optional assignments.

Also, Pumphrey's claims that Theodore failed to release her to apply for another position does not state retaliation as a matter of law. The evidence shows that she was passed over because she lacked the computer skills that were required. Moreover, Pumphrey testified that she did not know if Theodore was involved in the decision and had no reason to believe that he had any involvement in the decision.

Next, Theodore's Friday afternoon calls cannot be a basis for retaliation. Pumphrey admits that Theodore had the right to call her whenever he wanted. This conduct is nothing more than the kind of "minor annoyance" that the Supreme Court warned would convert Title VII into a "general civility code" if allowed to support a claim for retaliation. *Burlington*, 548 U.S. at 68.

Pumphrey further claims that Theodore's reluctance to let her visit her daughter when she was injured amounts to retaliation. But, she was never precluded from taking the time off. Pumphrey also alleges that Theodore engaged in retaliation by failing to give her managerial support when a computer problem was causing doctors to drop out of her database. There is no evidence, however, to establish that it was Theodore's responsibility to provide her with technical support. And, Pumphrey does not know whether Theodore assisted other employees with similar problems.

Pumphrey also alleges that Theodore engaged in retaliation by failing to obtain additional sales support for her territory, thereby making her workload unmanageable. Pumphrey has no evidence to show that this alleged conduct was causally connected to her complaint. In fact, the evidence shows that Pumphrey complained about this same issue before Theodore was her supervisor. Pumphrey complained about her workload to Bob Wisell in 2002, and she reiterated

those concerns to Mr. Theodore in July 2002, long before she made her complaints about Theodore.

The court concludes that none of these alleged retaliatory actions constitute materially adverse employment actions for purposes of a retaliation claim. Even viewing them cumulatively, many of the alleged actions relate to ongoing administrative problems that had been an issue long before Pumphrey made her complaint in January 2003. Accordingly, the court concludes that the only materially adverse employment action Pumphrey alleges is her termination.

**B. Causal Connection**

In order to make out a prima facie case with respect to her claim that her termination was in retaliation for her complaint against Theodore, Pumphrey must establish a causal connection between the complaint and her termination. "A causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

LifeScan argues that Pumphrey has failed to establish a causal connection between her January 2003 complaint and her December 2003 termination. Because her termination occurred nearly a year after Pumphrey complained, the lapse of time is too large to establish causation. *See Meiners*, 359 F.3d 1231 (holding that a time gap of two months and one week was too large to establish causation). Pumphrey, however, claims that her complaint against Theodore was the catalyst to a series of actions and decisions that ultimately resulted in her termination. Almost all of those actions and decisions to which Pumphrey refers, however, relate to or stem from

administrative and workload issues that existed well before her complaint in January 2003.

Whether or not her evidence establishes a causal connection, the parties focus heavily on whether Plaintiff can establish that LifeScan's stated reason for her termination is a pretext for retaliation. LifeScan's stated reason for Pumphrey's termination was that she continued to put personal charges on her corporate AMEX card after she was aware of the company policy against it, told by a supervisor to stop, and she had agreed to stop.

In 2001, LifeScan implemented a new policy prohibiting employee's from placing personal charges on their corporate credit cards. Pumphrey alleges that she was unaware of that policy until June 2003. However, in her 2002 performance evaluation, it states that Pumphrey's use of the corporate card was not within company policy. In June 2003, Pumphrey admits that she discussed the issue with Theodore. Pumphrey also admits that she agreed to discontinue the practice at that time. Pumphrey, however, continued to place personal charges on her corporate card. She admits that she continued to do so, even after she was aware of the policy, had been told to stop, and had promised to discontinue doing it. During the November 2003 meeting with Theodore and Schwier, Pumphrey attempted to explain why she was doing it and again promised to stop. It is clear from Theodore's notes of the meeting, that he and Schwier did not find Pumphrey's reasons believable.

Pumphrey's main theory is that LifeScan purposely delayed processing her expense reports, which forced her to pay thousands of dollars of business expenses out of her own personal account. Because she was depleting her personal bank account to pay for these business expenses, she claims that she needed to put personal charges on the company AMEX card. She states that she told this to Theodore and Schwier when they talked to her about personal charges

on the AMEX card and they did not do anything to help alleviate the delay in payments on her expense reports.

The problem with Pumphrey's theory, however, is that the evidence shows that employees were required to pay the corporate AMEX card and receive reimbursements from the company. Pumphrey's use of the card, therefore, did not give her any benefits. Whether she put personal charges on her corporate card or a personal card, she would have to pay it off and her actions were admittedly against company policy. Moreover, there is substantial evidence that for years Pumphrey had been late in submitting expense reports and had problems in attaching the necessary receipts. The delay in obtaining reimbursement, therefore, had been occurring for years. There is no connection between that delay and Pumphrey's complaints. To the extent that Pumphrey alleges that there was a longer delay in paying expenses after she made her complaint, she does not present evidence demonstrating it. She also speculates that Theodore had a role in delaying the reimbursements but, again, there is no evidence to support it. There is evidence that Theodore was made aware of problems with expense reports and audits, but there is evidence that Pumphrey was also made aware of the problems directly from the expense department and American Express. Furthermore, nothing in the record establishes that Theodore had any duty to make sure the company reimbursed Pumphrey.

While Pumphrey admits to the violation of the policy, her attempt to shift the blame for her policy violation cannot be a basis for demonstrating pretext. "[S]imply shifting the blame for a problem does not establish pretext. That is because, . . . in determining whether an employer's proferred reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of

whether the employer honestly believes in the reasons it offers." *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006); *D'Cunha v. N.Y. Hosp. Med. Ctr.*, 2006 U.S. Dist. LEXIS 11929 (E.D.N.Y. Mar. 3, 2006) ("plaintiff does not dispute that these errors occurred, but instead attempts to shift the blame elsewhere or explain why she did not perform her duties diligently. However, shifting the blame for failing to perform one's job duties diligently does not establish pretext.").

Pumphrey argues that Theodore promised to give her a free pass or place her on a progressive discipline plan but that alleged promise was in relation to her delays in submitting expense reports, not in relation to her practice of putting personal charges on her corporate AMEX card. Pumphrey's allegations are, therefore, not relevant to the determination of whether her termination for the AMEX policy violation was pretextual. Pumphrey cannot show the LifeScan failed to comply with any of its written policies. Her conduct qualifies as Group I conduct which may result in immediate termination.

Pumphrey takes issue with whether her conduct harmed the company. Such an inquiry is irrelevant. The court does "not sit as a 'super personnel review board' that second-guesses an employer's facially legitimate business decisions." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). Long before Pumphrey complained about Theodore's conduct, LifeScan implemented a policy prohibiting employees from putting personal expenses on corporate cards. It is not the court's role to question the employer's business decision in implementing the policy.

Similarly, Pumphrey questions LifeScan's decision to terminate her for an administrative policy violation while she was a top sales representative in the company. Again, the court does not second guess the business judgment of the employer. *Selenke v. Med. Inaging of Colo.*, 248

F.3d 1249, 1259 (10th Cir. 2001). "[T]he relevant inquiry is not whether [the employer's] articulated reason for discharge was wise, fair or correct, but whether they honestly believed their reason and acted in good faith upon that belief." *Evans v Dean Foods Co.*, 2000 WL 1260493 (10th Cir. Sept. 6, 2000).

In addition, Pumphrey questions LifeScan's stated reason for her termination because she alleges that it was not provided to her at the time of termination. However, the evidence demonstrates that Theodore wrote an email to Schwier the day after Pumphrey's termination outlining exactly what happened during the meeting terminating Pumphrey. The email copies the corporate representative who was also present during the termination. Pumphrey was clearly told the basis for her termination was her disregard for the company's AMEX policy. It is clear from the email that Pumphrey was notified of the basis for her termination when it occurred.

Pumphrey also takes issue with the timing of her termination. She questions why she was terminated in December for violating the AMEX policy when she agreed to abide by the policy at the meeting in November. This argument, however, ignores the evidence that she had previously agreed to abide by the policy when it was brought to her attention in June 2003 and she failed to do so. There is nothing in the evidence that establishes that the AMEX issue was resolved at the November 2003 meeting with Theodore and Schwier, only that the problem was discussed. The notes after the meeting demonstrate that Pumphrey's supervisors felt that her reasons for disregarding the AMEX policy were ridiculous, did not make any sense, and did not support her continued use. Nothing in the record indicates that LifeScan had determined whether or not Pumphrey would be terminated for her insubordination or disregard for company policy as of the date of the November 2003 meeting. That a determination to terminate Pumphrey for such

conduct was made after the meeting and implemented several weeks later does not call into question the validity of the reason.

Moreover, Pumphrey has no evidence to rebut LifeScan's evidence that five employees were terminated for violation of the company's AMEX policy. While Pumphrey points to two employees whose violations were more severe, she cannot dispute that several employees were terminated for AMEX policy violations. Pumphrey has not pointed to a similarly situated employee who was treated less harshly than she was treated for similar misconduct. Pumphrey has not met her burden on summary judgment to show that her termination was in retaliation for complaining about Theodore.

In summary, the court concludes that none of the retaliatory acts alleged by Pumphrey support her retaliation claim. The numerous acts complained of are not materially adverse employment actions as required for a Title VII retaliation claim, and/or are not causally connected to Pumphrey's complaint, and/or are justified by legitimate non-retaliatory reasons. Pumphrey has not met her burden of producing evidence that shows that LifeScan's reason for her termination is a pretext for retaliation. Thus, the court concludes that Pumphrey's retaliation claim fails as a matter of law and LifeScan is entitled to summary judgment.

## CONCLUSION

Based on the above reasoning, Defendant's Motion for Summary Judgment is GRANTED as to each of Plaintiff's claims. Because this ruling disposes of all of Plaintiff's claims, the Clerk of Court is directed to the close the case. Due to the particular circumstances presented by the case, the court finds that each party shall bear her and its own fees and costs. Although Defendant has prevailed on summary judgment, Plaintiff's case was not frivolous,

unreasonable, or without foundation. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978).

DATED this 29th day of January, 2010.

BY THE COURT:

DALE A. KIMBALL
United States District Judge